## Staunton.

LEONARD & OTHERS v. ST. JOHN.

September 10, 1903.

Absent, Buchanan, J.*

1. EVIDENCE—*Depositions—Retaking, When Allowed—Code, Sec. 3364.*—Since the enactment of section 3364 of the Code the deposition of a witness may be retaken without the consent of the court first obtained, and may be read on the trial if the court, in the exercise of a sound discretion, would have directed such re-examination. Prior to that enactment such was not the law, and the previous consent of the court was necessary. Since that enactment the court may direct a deposition to be retaken, where justice seems to require it, or may permit it to be taken without consent under the conditions above mentioned, and in either case this court will not reverse the action of the trial court unless it is palbably erroneous.

2. RUNNING WATER—*Title To—Lapse of Time.*—No lapse of time will bar the owner of land from having a stream flow through the same in its natural bed or channel, as he holds that right by the same title that he holds his land.

3. RUNNING WATER—*Original Channel—Case in Judgment.*—The evidence in this cause establishes the contention of appellee as to the location of the original bed or channel of the stream in the proceedings mentioned, and shows unmistakably that the flowing of the stream on the land of appellee did not have its origin in the consent of appellants' grantor as contended by them, and hence is not revocable at their will.

Appeal from a decree of the Circuit Court of Smyth county pronounced September 13, 1902, in a suit in chancery wherein the appellee was the complainant, and the appellants were the defendants.

*Amended and Affirmed.*

The opinion states the case.

*Judge Buchanan was detained at home by sickness.

*G. H. Fudge* and *J. H. Gilmore,* for the appellants.

*N. C. St. John* and *H. N. Bell,* for the appellee.

CARDWELL, J., delivered the opinion of the court.

The complainant, A. F. St. John, and the defendants, William E. Leonard and others, own adjoining lands in Smyth county, separated by a public road, the general direction of which road is about north and south, the division line between the two tracts being in the middle, or nearer the west line, of the road. On the east side of this road, just inside of the defendants' land, as inclosed, there is a strip of bottom and swampy land parallel to the road the whole length of the defendants' land bordering on the road, and extending over the road upon the complainant's land at several points. Formerly this strip of swampy land was unreclaimed for cultivation, and a stream rising upon a tract of land adjoining the defendants on the north passed onto the St. John land, then returning to the defendants' land and running in a zigzag course along the side of the public road onto the lands adjoining complainant and defendants on the south, diverging at two points across the road onto the land of the complainant. At the first point of diversion the stream ran on the lands of the complainant $11\frac{1}{2}$ poles, and then recrossed the road to the defendants' land. The second point of diversion was a few hundred yards below the first and $2\frac{1}{2}$ poles north of the southern line of the defendants' land, where the stream again crossed the road onto the complainant's land, and from there ran through his land 7 60-100 poles to the land adjoining him on the south. Complainant acquired title to his land from his father, Berry St. John, and the defendants from their father, William Leonard; both of these ancestors (now dead) being the grantees of their respective lands from the same grantor, namely, David Winniford; Berry St. John acquiring title to the tract of land a part of

which is now owned by the complainant about the year 1844, and William Leonard acquiring title to the land now owned by the defendants about the year 1851 or 1852. The complainant, in his bill for an injunction in this cause restraining the defendants from interfering with his use of the water from the stream in question at the two points mentioned, and to require the defendants to restore the flow of the water upon his lands as it formerly flowed, makes the contention that at the time his father (Berry St. John) became the owner of the land, and before that time back to a period whereof the memory of man runneth not to the contrary, this branch or stream of running water ran from the northern part of the land of Berry St. John (now and for several years owned by the complainant) onto the land of William Leonard, now owned by the defendants, and did in its meanderings and while following in its natural bed and channel recross the public road to the St. John land at a given point, and while following its original bed and channel ran 11½ poles thereon to a point below where it recrossed the road onto the Leonard land; that, after running some distance on the Leonard land, following its natural bed and channel, it again crossed back to the St. John land, and ran thereon 7 60-100 poles, passing onto the land now owned by Martin Lewis adjoining the lands of the complainant and defendants on the south. With the bill is filed a plat or diagram and certificate of the county surveyor, A. F. Bonham (which diagram or plat is spoken of in this record as the "Bonham Map"), showing the location of the lands of the complainant, the defendants, and others, the location of the branch or stream as running at present, and its natural bed and channel where it ran over the lands of the complainant at two points, and designating and locating other points on the premises. After setting out that the branch or stream in question, following its natural bed and channel, ran twice upon the land of the complainant, as indicated on the Bonham map, from 1844 back to a period beyond

which the memory of man cannot go, the bill further avers
that this running stream upon the complainant's land was used
and enjoyed by Berry St. John at the two places indicated on
the Bonham map without protest, hindrance, interference, or
adverse claim of the owner of the Leonard land, or by any per-
son whomsoever down to the time when Berry St. John turned
over his land to the management of his two sons, the complain-
ant, and N. C. St. John, in 1865; that a short while prior to
1861 William Leonard, under the claim of desiring to drain
his land bordering on the public road, and through which the
stream in question ran, cut a ditch from a point opposite or
west of his residence to or near the southern boundary of his
land, which ditch was just inside of his field, and ran parallel
to the road, but was not on the bed or channel of the stream,
except at points in the Leonard land, the effect of which ditch,
deepened from time to time by floods or otherwise, was to divert
the water from the St. John land to a channel entirely on the
Leonard land, except at the second or lower point of diversion
to the St. John land as indicated on the Bonham map; but as
William Leonard disclaimed any intention or purpose of divert-
ing the water from the St. John land, and as the supply of
water at the second or lower point of diversion to his land was
sufficient for his purposes, Berry St. John acquiesced in the
withdrawal of the water from the first or upper point of diver-
sion; that, after the digging of the ditch referred to, Berry St.
John, and the complainant claiming under him, by means of a
dam thrown across the stream, restored and repaired from time
to time as occasion required, kept the water flowing in its natu-
ral bed and channel, as shown on the Bonham map, at the
second or lower point of diversion, without objection, protest,
hindrance, or adverse claim of any person or persons down to
the year 1899, when the defendants removed the dam, and de-
nied the right of the complainant to restore it, or to the use of
the water from the stream; whereupon the bill in this cause

was filed, praying an injunction restraining the defendants from interfering with the complainant's right to the use of the water from the stream in question at the two points of diversion to his land as indicated on the Bonham map, which injunction was granted. The defendants, in their answer, practically admit a number of the important facts alleged by the complainant in his bill, among which are that Berry St. John had the use of the water from the stream in question flowing onto his land from as far back as 1858 or 1859 to the time of his death, in 1869, and that thereafter those claiming under him were not deprived of the use of the water until 1899, when the defendants tore out the dam put across the stream by the complainant, which dam was made necessary by the deepening of the stream by the defendants from time to time, and refused to allow him to replace the dam, or by other means to restore the water to his lands. They further admit the legal proposition asserted in the bill that no lapse of time will bar the right of the owner of land to have a stream flow through the same in its natural bed or channel, "because he holds that by the same title he holds his land"; but they make the contention that the stream in question never flowed in its natural bed and channel upon the lands of the complainant, as claimed by him, but was diverted thereto by the means of ditches dug by Berry St. John across the public road into his land with the permission and by the sufferance of William Leonard, which permission or mere license William Leonard, or the defendants since his death, had the right to revoke at will.

Upon the hearing of the cause, on the pleadings, the exhibits therewith filed, and depositions of witnesses, the Circuit Court, overruling the exceptions taken by the defendants to the deposition of John L. Sanders and others retaken in the cause, and being of opinion that the complainant, by a preponderance of the testimony, is sustained in his contention that he "is entitled to the use of the water which heretofore, until diverted by the

ditch of the defendant, flowed into and out of the land now owned by complainant, as shown by the map of A. F. Bonham, from F to G and from C to D,   .   .   .   and to have the said flow of water restored between those points," made its decree, perpetuating the injunction theretofore awarded, and requiring the defendants to restore the flow of the water from the stream upon the lands of the complainant as claimed by him, and further ordering that, unless the defendants restored the flow of water to the land of the complainant at the points E and B indicated on the Bonham map, where it enters his line, within thirty days from the date of the decree, then A. F. Bonham, appointed a commissioner for the purpose, should "go upon the land in controversy with one or two hired laborers, and without any needless or avoidable injury to defendants, and restore the flow of water to the lands of the complainant, employing the labor reasonably necessary to do so, and for the purpose may dam the ditch of the defendants and ditch the lands of the complainant to an extent reasonably sufficient to restore the flow of water to the lands of the complainant at the points indicated," etc.   This decree we are asked to review and reverse.

The first error assigned is to the ruling of the court allowing the depositions of John L. Sanders and others, taken a second time, to be read and considered.

Prior to the insertion of section 3364 into Chapter 164 of the Code of 1887 by the revisors, the deposition of a witness could not be retaken in any case without the consent of the court first obtained, and the granting of authority for the second examination was regarded as being within the sound discretion of the trial court, and this court would not reverse the decree for that cause unless it appeared palpably improper for the court to have allowed the second examination (*Fant* v. *Miller, &c.*, 17 Gratt. 187; *Carter, &c.* v. *Edmonds*, 80 Va. 58; *Booth* v. *McJilton*, 82 Va. 827, 1 S. E. 137, 2 Barton's Chan. Pr. 759); but since section 3364 of the Code, *supra*, went into ef-

fect, the deposition of a witness may be retaken in any case without the consent of the court first obtained, and may be read, if the court, upon application, in the exercise of a sound discretion, would have made an order for such re-examination. With the statute in force, it is still within the discretion of the court to order the retaking of the deposition of a witness, if of opinion that justice requires it, as well as to allow the reading of a deposition retaken without its consent, if the circumstances are such that the court would have made an order for such re-examination; and this court will not, in either case, reverse the decree unless it can be said that the court exceeded the limits of a reasonable discretion, and therefore committed a palpable error.

In this case the decree states that the second depositions of John L. Sanders and others were allowed to be read "because the court, upon application, in the exercise of a sound discretion, would have made an order for such re-examination"; and we are of opinion that the facts and circumstances testified to on behalf of defendants after the first deposition of John L. Sanders and others were taken plainly show that the court did not exceed the limits of a reasonable discretion in reading and considering the depositions in question.

It being too well settled to admit of controversy that no lapse of time will bar the owner of land of the right to have a stream flow through the same in its natural bed or channel, as he holds that right by the same title that he holds his land, the remaining issue in this case is purely one of fact—namely, whether the natural bed or channel of the stream in question is on the St. John's land at the two points indicated on the Bonham map and as claimed by appellee, or entirely east of the road on the Leonard side.

E. D. Faris, an intelligent witness, 73 years of age, testifying for appellee, states that he owned after his father the land now owned by Martin Lewis adjoining the St. John and Leonard

tracts on the south; that he went to live on this adjoining land when 9 years of age, and lived thereon until 21 years of age; that he was then on and off the land until 1865, and on it eighteen years after 1865, and since then a frequent visitor there; that he went to school on the St. John land, passing over the Leonard land to and from school, and had other opportunities of being familiar with the premises. He then states with apparent familiarity and accuracy the location of the stream in question as flowing in its natural bed or channel on the St. John land prior to 1865, and back as far as 1838, at the two points indicated on the Bonham map, and verified the map as correctly showing where the stream flowed from his earliest recollection, and states other facts corroborating his version as to where the stream flowed in its natural bed or channel originally.

Ten or more other disinterested witnesses, showing their familiarity with the stream and its surroundings, some of them as far back as 1842, bear out the statement of the first witness, Faris, and the contention of appellee. The contention of appellee is also borne out by his own testimony, that of his brother, N. C. St. John, both of whom are over 50 years of age, and also by William Hutton, 74 years of age, and who had lived on the Leonard land and adjoining it in his early life, examined as a witness for the appellants.

To overcome this evidence appellants rely on their own depositions and those of two other witnesses. The depositions of these two last-named witnesses show a total lack of knowledge and recollection of the premises upon which to rest the statements they make, and their respective statements are further discredited by contradictions of themselves and of facts admitted in the answer of appellants and in their own depositions.

Nearly all the witnesses testifying to the ancient course or bed of this stream in question, carry it back as running upon the St. John land at the two points indicated on the Bonham

map to a time prior to 1852, and before the land on the east of the stream was owned by William Leonard, and before the land on either side, except at a watering gap used by Berry St. John, was reclaimed or inclosed; thus showing unmistakably that the flowing of the stream across the road onto the St. John land did not have its origin in the consent of William Leonard about the year 1858, as appellants contend. Nor does the conformation of the ground bear out their contention. On the contrary, the circular bank at the two points on the St. John land indicated on the Bonham map and testified to by the witnesses, are physical facts, strongly tending to prove that the stream ran in its natural bed or channel as contended for by appellee. Appellee's land, along the course of the original channel of the stream at the first point of diversion across the road to his land slopes down from the west to the bottom through which the stream ran, and the channel of that stream at that point has been filling up by washings from his land since the stream was withdrawn therefrom by the ditch cut by William Leonard, before mentioned, whereas a running stream would have kept the channel open, and caused the circular bank and the channel to remain as distinctly shown as they formerly were, according to the statements of a number of witnesses.

Upon the whole case we are of opinion that the Circuit Court did not err in so far as it held that appellee is entitled to have the stream in question flow onto and out of his land from F to G and from C to D, as indicated on the Bonham map, and perpetuated the injunction theretofore awarded restraining appellants from interfering in any wise with appellee in the use and quiet enjoyment of the water of the stream as it originally flowed onto his land at the two points mentioned; but, as the water was withdrawn from his land where it entered thereon at E, and flowed from F to G, the first or upper point indicated on said map, by William Leonard prior to 1865, with the consent or acquiescence of Berry St. John until his death, and of ap-

pellee from that time to the institution of this suit, the decree should not have gone so far as to require appellants to restore the flow of the stream on to appellee's land at that point, although the latter has not lost any of his rights to its flow there by his nonuser of the water at that point since it was withdrawn from his land by the ditch dug by William Leonard, and the decree in this respect will be amended, and, as so amended, will be affirmed. Such amendment of the decree, however, is not to be construed as taking from appellee the right to restore the flow of the water from the stream in question onto his land at point E indicated on the Bonham map, and to flow thereon and out of his land from F to G, should he elect to do so.

*Amended and Affirmed.*